UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 5:25-cv-02557-SSS-DTBx | Date | December 19, 2025 |
|---|---|---|---|
| Title | *Lamar Central Outdoor, LLC v. City of Perris et al.* | | |

Present: The Honorable    SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):    Attorney(s) Present for Defendant(s):
None Present    None Present

**Proceedings:    (IN CHAMBERS) ORDER GRANTING PRELIMINARY INJUNCTION [DKT. NO. 10]**

On October 10, 2025, Plaintiff Lamar Central Outdoor, LLC filed an Ex Parte Application for a Temporary Restraining Order ("TRO") against Defendant City of Perris ("City"). [Dkt. No. 10, "App."]. Plaintiff sought to enjoin the City from enforcing the Ordinances restricting cannabis advertisements on billboards against Plaintiff and any other person or entity engaged in cannabis advertising within the applicable area. [*Id.* at 16]. On October 10, 2025, the Court granted Plaintiff's Application and issued the TRO. [Dkt. No. 18]. On the same date, the Court issued an Order to Show Cause as to why a preliminary injunction should not be issued. *Id.* The Court heard arguments on December 4, 2025. [Dkt. No. 37]. Upon consideration of the briefing and oral arguments, the Court **GRANTS** the preliminary injunction.

## I.    BACKGROUND

Plaintiff is an outdoor billboard advertising company that owns and operates 14 outdoor billboard advertising structures (28 faces) in the City. [Dkt. No. 10-2, "Porter Decl." ¶ 3–4]. Its billboards in the City are located along the I-215 highway. [*Id.*]. Plaintiff also owns and operates 9 outdoor billboard structures (18 faces) within a one-mile radius of the City and within 660 feet of a freeway.

[*Id.* ¶ 4].  Of these billboards, Plaintiff had cannabis advertisements on 12 billboard faces.  [*Id.* ¶ 5].

On August 26, 2025, the City Council of the City of Perris passed Ordinances 1460 and 1461 ("Ordinances"), amending the City's Municipal Code to ban cannabis advertising on off-site freeway signs.  [Dkt. No. 10-4, "Volume of Exhibits" or "VOE", Ex. 6; Dkt. No. 10-1, "Stream Decl." ¶ 9].  Specifically, they prohibit cannabis dispensaries and commercial marijuana operation permittees from advertising its business or operation on any off-premises advertising display on a sign or other structure, including billboards that are located both within the City, within a one-mile radius of the City boundaries, and within 660 feet of the nearest edge of a freeway right-of-way line.  [VOE, Exs. 5, 8, 9; Stream Decl. ¶ 9].

The following are the City's justifications for the Ordinances: (1) the restriction is "in response to concerns with cannabis advertisement along the I-215 Freeway, which creates a negative perception of the City as a desirable place to live, visit, or invest, especially given ongoing concerns about health and safety associated with cannabis use;" (2) "the proliferation of cannabis advertisements along I-215 can reasonably create or add to a false public perception, particularly for people driving to, though, or from the City on I-215, that the City has little to offer other than cannabis businesses, or that the City has an undue proliferation of cannabis businesses;" (3) "studies have shown that cannabis businesses still carry a negative connotation associated with drug use, nuisances, criminal activity, smoking and/or other health and safety concerns in the minds of many people, and in some cases can have a negative effect on property values;" and (4) "the presence of cannabis advertisements along 1-215 in or within close proximity to the City's boundaries has a negative effect on the public perception of the desirability of the City as a place to visit, do business, or live, resulting in adverse impacts to economic development and public welfare in the City."  [VOE, Ex. 5; Stream Decl. ¶ 9].

However, the City does allow cannabis businesses to lawfully operate in the City and has stated that it is "not averse to commercial cannabis activity that is compliant with State and local law."  [*Id.*].  The City also allows cannabis cultivation, distribution, manufacturing, testing, and retail.  [VOE, Ex. 11; Stream Decl. ¶ 10.].  It approved a comprehensive regulatory program for cannabis related operations in 2016 to "ensure the health, welfare, and safety of the City's residents, while complying with State law."  [*Id.*].  In 2021, the City passed an ordinance to expand the zones in the City where cannabis cultivation and distribution are allowed, citing the reason as "the lack of available property zoned for cannabis use."  [VOE, Ex. 6; Stream Decl. ¶ 9].  The City currently has at least 8 cannabis

dispensaries operating within the City.  [Dkt. 1, "Complaint" or "Compl" ¶ 18].  However, it is no longer accepting new cannabis retail use permit applications.  [VOE, Ex. 11; Stream Decl. ¶ 10].  As result of the Ordinances, Plaintiff has been forced to remove its cannabis advertisements from 12 faces of its billboard structures located within the City and within a one-mile radius of the City and 660 feet of a freeway.  [Porter Decl. ¶ 5].

Plaintiff filed a Complaint on September 26, 2025, for Declaratory and Injunctive Relief against the City, seeking to permanently enjoin the City from enforcing the Ordinances against Lamar or any other person or entity engaged in lawful, truthful, and non-misleading cannabis advertising, on the grounds that such enforcement violates Lamar's commercial speech rights under the First Amendment to the United States Constitution and Article I, Section 2 of the California Constitution.  [Compl. ¶ 1–5].  On October 10, 2025, Plaintiff Lamar Central Outdoor, LLC filed an Ex Parte Application for a Temporary Restraining Order against Defendant City of Perris.  [App.].  Defendant filed its Opposition, [Dkt. No. 15, "App. Opp."], and evidentiary objections,[1] [Dkt. No. 16], on October 6, 2025. On October 10, 2025, the Court issued a TRO and an Order to Show Cause as to why a preliminary injunction should not be issued.  [Dkt. No. 18].  On

---

[1] "A preliminary injunction may only be awarded 'upon a clear showing' of evidence that supports each relevant preliminary injunction factor."  *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1030 (E.D. Cal. 2022), *aff'd*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "This 'clear showing' requires factual support beyond the allegations of the complaint, *but the evidence need not strictly comply with the Federal Rules of Evidence*."  *CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JCx, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)) (emphasis added).  "A verified complaint or supporting affidavits may afford the basis for a preliminary injunction . . . ." *K-2 Ski Co. v. Head Ski Co*., 467 F.2d 1087, 1088 (9th Cir. 1972) (citing *Ross-Whitney Corp. v. Smith, Kline & French Labs.*, 207 F.2d 190, 198 (9th Cir. 1953)).

In light of the relaxed evidentiary standard for preliminary injunction proceedings, the Court need not rule on admissibility.  However, for purposes of the preliminary injunction, the Court has considered the likely admissibility of the evidence in determining whether the Plaintiff has demonstrated a likelihood of success on the merits.  Where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court has overruled the objection.

---

October 17, 2025, Defendants filed an Opposition as to why a preliminary injunction should not be issued. [Dkt. No. 21, "Preliminary Injunction Opp."]. On October 20, 2025, Plaintiff filed a Reply to Defendants' Opposition in support of Plaintiff's Request for a Preliminary Injunction. [Dkt. No. 23, "Preliminary Injunction Rep."].

## II.    LEGAL STANDARD

A Court may grant a preliminary injunction to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). The purpose of a preliminary injunction "is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). The party seeking such relief must establish: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities weighs in its favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because a "preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689 (2008), the party seeking the injunction must present evidence sufficient to clearly carry his burden of persuasion on each requirement, *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (citation modified); *see also Winter*, 555 U.S. at 22 (explaining that a preliminary injunction can issue only on "a clear showing that the plaintiff is entitled to such relief").

Courts in the Ninth Circuit evaluate these factors on a "sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Additionally, a preliminary injunction is appropriate when plaintiff raises "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135. A "serious question" is one on which the plaintiff "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

## III.    DISCUSSION

### A.    Likelihood of Success on the Merits

The Court considers Plaintiff's showing on the first *Winter* factor, likelihood of success on the merits. Plaintiff's Request for Preliminary Injunction is premised

on its First Amendment claims for infringement on its commercial speech rights and on its state law claim under Article I, Section 2 of the California Constitution.

For almost two centuries, commercial speech, *i.e.*, "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980), was understood to fall outside of the First Amendment's ambit. *See, e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942). That all changed in 1976, when the Supreme Court extended the First Amendment's protections to such speech in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976). Just four years later, *Central Hudson* set out the governing framework for analyzing commercial speech restrictions. *See* 447 U.S. at 561–66.

In doing so, *Central Hudson* recognized that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563. Subsequent cases have continued to make this distinction, noting commercial speech's "subordinate position in the scale of First Amendment values" and the government's correspondingly "ample scope of regulatory authority" in the commercial speech realm. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). So, the Supreme Court has "always been careful to distinguish commercial speech from speech at the First Amendment's core." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995).

Because of its subsidiary status, commercial speech can be subjected to "modes of regulation that might be impermissible in the realm of noncommercial expression." *Fox*, 492 U.S. at 477. For instance, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson*, 447 U.S. at 563. Strict scrutiny is therefore improper when reviewing laws that regulate commercial speech. Instead, the Court applies the following four-part intermediate-scrutiny analysis from *Central Hudson* here:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

These four parts are "not entirely discrete"; they are all "important and, to a certain extent, interrelated," as "the answer to [one part] may inform a judgment concerning the other three." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183–84 (1999). For more than four decades, this has been the governing test for regulations of commercial speech. *Recht v. Morrisey*, 32 F.4th 398, 408 (4th Cir. 2022).

Commercial illustrations and advertisements on billboards are entitled to the same First Amendment protections afforded verbal commercial speech, and restrictions on the use of visual media of expression in advertising must survive intermediate scrutiny under the test of *Central Hudson*. *Zauderer v. Off. of Disciplinary Couns. of the Sup. Ct. of Ohio*, 471 U.S. 626, 647 (1985); *see also Citizens of Free Speech, LLC v. Cnty. of Alameda*, 114 F. Supp. 3d 952, 969 (N.D. Cal. 2015) (applying the *Central Hudson* test when determining whether a county zoning ordinance that regulated billboards and advertising signs violated the First Amendment). Here, the speech at issue concerns advertisements on billboards, so the *Central Hudson* test governs the Court's analysis. The Court will discuss each prong of the test in turn.

### 1.    Whether the Communication Is Misleading or Related to Unlawful Activity

Plaintiff argues that the billboard advertisements at issue satisfy the first prong of the *Central Hudson* test because they concern lawful activity–cannabis is legal in California and the advertisements are for permitted cannabis businesses operating in a city in California. [App. at 19]. Defendants previously argued in their Opposition to the TRO Application that the advertisements are not afforded First Amendment protections because federal law is supreme under the Supremacy Clause of the U.S. Constitution, rendering advertisements of cannabis distribution as concerning unlawful activity for the purposes of the *Central Hudson* test. [App. Opp. at 8–12].

In their Opposition to Plaintiff's Request for a Preliminary Injunction, Defendants primarily adopt the Fifth Circuit's reasoning in *Cocroft v. Graham*, 122 F.4th 176 (5th Cir. 2024), to again argue that cannabis-related billboard advertisements are not afforded First Amendment protections because they concern "unlawful activity" for the purposes of the first prong of the *Central Hudson* test. [Preliminary Injunction Opp. at 8–9]. This Court distinguishes the Fifth Circuit's

rigid construction and application of the first prong of the *Central Hudson* test, and it finds that the speech at issue here satisfies the first prong of the test.

### i.    "Same-Sovereign" Theory

The Court first discusses what the Fifth Circuit calls the "same-sovereign" theory of commercial speech regulation: the sovereign that enacted the law regulating the underlying conduct has the power to enact laws restricting related commercial speech. *Cocroft*, 122 F.4th at 180 (rejecting this theory). In essence, this theory ties the illegality of a conduct to the jurisdiction that is banning the commercial speech. *Id.*

The Supreme Court has held that the "State's power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is "linked inextricably" to those transactions. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996) (plurality opinion). In other words, the power to regulate commercial speech flows directly from the regulating state's exercised power to regulate said conduct or transaction. This rule is sensible, as the Eighth Circuit noted, because "[i]t would be illogical to permit [a state] to prohibit the sale and possession of [a product] while not allowing the state to regulate advertising which encourages these same crimes." *Casbah, Inc. v. Thone*, 651 F.2d 551, 564 (8th Cir. 1981). Thus, the state may regulate "advertising [that] . . . encourages activities which are otherwise crimes under [that state's] law." *Id.*

Courts have capitalized on the identity of the sovereign under which the underlying conduct or transaction takes place when deciding whether a state can regulate speech related to that conduct or transaction. For example, as far back as *Bigelow* v. *Virginia* (a pre-*Central Hudson* case), the Supreme Court struck down a ban on abortion-related advertisements in Virginia, as applied to plaintiff advertising abortion services in New York, where abortion was legal. 421 U.S. 809 (1975). In finding that Virginia could prohibit ads offering abortion only in Virginia, but not in New York, the Court's admonition in *Bigelow* was clear: A state "may not, under the guise of exercising *internal* police powers," encumber speech "about an activity that is legal" *externally*, *i.e.*, in another state. *Id.* at 824–25 (emphasis added); *see also Nat'l Ass'n of Tobacco Outlets, Inc.* v. *City of Worcester*, 851 F. Supp. 2d 311, 315 (D. Mass. 2012) (interpreting Supreme Court precedent "to mean that an activity is 'lawful' under the *Central Hudson* test so long as it is lawful where it will occur").

The First Circuit considered a similar question. *See New England Accessories Trade Ass'n, v. City of Nashua*, 679 F.2d 1, 3 (1st Cir. 1982). In *New*

*England Accessories*, the First Circuit heard a First Amendment challenge to a New Hampshire statute making it illegal to place drug paraphernalia advertisements outside of the state, even if the sale of drug paraphernalia was legal in other states. *Id.* at 3. The court held that drug paraphernalia advertising did not receive First Amendment protections because it promoted illegal ingestion of drugs, which was "criminal in all jurisdictions." *Id.* But the First Circuit noted in a footnote that "[i]f New York, or some other state, decided to legalize the sale and use of marijuana, New Hampshire would have greater difficulty . . . prohibiting an advertisement" pertaining to marijuana. *Id.* at 4. This statement implies that courts would extend First Amendment protection to advertising for activities that are legal in the state where the transaction would occur.

The Ninth Circuit reinforced this implication in *Washington Mercantile Association v. Williams*, holding that the

> [s]ale or delivery of drug paraphernalia is illegal in Washington, so advertisements for sales in or mail orders from Washington are unprotected speech. In contrast, the advertiser who proposes a transaction *in a state where the transaction is legal is promoting a legal activity. Its speech deserves First Amendment protection*.

733 F.2d 687, 691 (9th Cir. 1984) (emphasis added).

On the other hand, in *Cocroft v. Graham*, the Fifth Circuit distinguished the Ninth Circuit's holding in *Washington Mercantile*, stating that it only involved conflicting laws of two different *states* and said nothing about when state law conflicts with federal law. 122 F.4th at 876. The court discarded the *Washington Mercantile* court's dependence on *Bigelow v. Virginia*, 421 U.S. 809 (1975), which held that "the First Amendment analysis focuses on whether a transaction is legal under the laws of the state where it is proposed, not whether it is illegal under the laws of another jurisdiction." *Bigelow*, 421 U.S. at 824–25; *Cocroft*, 122 F.4th at 182. To the *Cocroft* court, "of another jurisdiction" necessarily included federal law because federal law is the law of every state's jurisdiction, and the court there further reasoned that *Bigelow* merely governs conflicts of law among different states. *Cocroft*, 122 F.4th at 182.

However, this interpretation of *Bigelow* improperly severs the connection between the underlying conduct to the speech and the identity of the sovereign that is regulating commercial speech related to said conduct, running contrary to the Supreme Court's articulation of this principle in *Bigelow* and *44 Liquormart* and the lower courts' interpretation of this principle. The Court thus finds that

California's power to regulate speech concerning medical and adult-use cannabis is a "concomitant power"—one that is defined and delimited by the extent to which California has regulated that product.  So, if medical and adult-use cannabis is legal under state law, so too must be the advertising of it under state law.[2]  The Court now moves on to addresses Defendants' Supremacy Clause argument

## ii.       Supremacy Clause and California's Cannabis Laws

For their Supremacy Clause argument, Defendants again adopt the Fifth Circuit's reasoning in *Cocroft v. Graham*.  In *Cocroft*, the Fifth Circuit invoked *Gonzales v. Raich*, 545 U.S. 1 (2005), in reasoning that the First Amendment poses no obstacle to Mississippi's cannabis-related commercial-speech restrictions because the Supremacy Clause "unambiguously provides" that the federal Controlled Substances Act (CSA) governs even in states with more permissive marijuana laws.  *Cocroft*, 122 F.4th at 184; [Preliminary Injunction Opp. at 8–9]. The Fifth Circuit then held that the medical marijuana advertisements did not qualify for First Amendment protections under *Central Hudson* because such speech did not concern lawful activity—federal law criminalizes medical marijuana in every state, including Mississippi.  *Cocroft*, 122 F.4th at 184.  This Court respectfully disagrees with the *Cocroft* court and instead finds that the Supremacy Clause poses no obstacle to the Court in progressing through its *Central Hudson* analysis.

The United States is a dual-sovereign system, under which both the federal and state governments may legislate on the same subject.  *Printz v. United States*, 521 U.S. 898, 918 (1997) ("It is incontestable that the Constitution established a system of 'dual sovereignty."").  This is why, for example, a person may be prosecuted under both federal law and state law for the same underlying act, without violating the Double Jeopardy Clause.  *See, e.g.*, *United States v. Lanza*, 260 U.S. 377, 382 (1922).  Thus, while it is true that cannabis is illegal under federal law, it can also be true that medical and adult-use cannabis is legal under California state law.  The fact that a federal law applies to a subject does not necessarily mean that a differing state law on that subject is invalid under the Supremacy Clause.

---

[2] See Part III.D *infra* for discussion of why the advertisements are not unlawful under California Business and Professions Code section 26152(d).

The Supreme Clause only comes into play when there is an *actual positive* conflict between the state and federal laws, for example, when it is impossible to comply with both laws, or when the state law stands as an obstacle to the federal law. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (stating that preemption exists when "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (alterations in original)). In such circumstances, the Supremacy Clause dictates how to resolve such conflict: the state law is preempted by the federal law.

The Fifth Circuit and Defendants' reliance on *Raich* is misplaced. *Raich* simply held that, under the Commerce Clause, the CSA's reach extends not only to *interstate* but also *intrastate* manufacturing and possession of medical cannabis. *Raich*, 545 U.S. at 22. Under such circumstances, the legality of medical cannabis under state law cannot provide a defense to the federal government's enforcement of the CSA under federal law—that much is clear as a straightforward application of the Supremacy Clause. *Id.* at 29. However, *Raich* did not declare that the CSA rendered state marijuana laws invalid. That is not what the Supremacy Clause requires.

Preemption analysis under the Supremacy Clause begins with the text of the CSA itself, which expressly provides that it does not preempt state law "unless there is a *positive* conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together." 21 U.S.C. § 903 (emphasis added). A positive conflict exists only where compliance with both laws is impossible, or where the state law would obstruct the objectives of Congress. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Absent this positive conflict, none of the CSA's provisions should be "construed as indicating an intent on the part of Congress to occupy the field in which that provision operates . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the state." 21 U.S.C. § 903. That is a high bar, and one the Fifth Circuit did not even acknowledge in *Cocroft*.

Here, compliance with both laws is not impossible, nor does California's law obstruct the objectives of Congress. California's law does not require anyone to violate the CSA. It simply removes state-level penalties for certain medical and adult uses of cannabis and establishes a regulatory framework for doing so lawfully within the state. *See* Cal. Bus. & Prof. Code § 26000 (regulating the commercial cannabis industry in the state through a comprehensive regulatory framework established by the Medicinal and Adult-Use Cannabis Regulation and

Safety Act (MAUCRSA)).  The power to make that choice lies squarely within the state's traditional police powers to regulate medicine and public health.  As such, the Fifth Circuit's analysis should have proceeded under an assumption *against* preemption, rather than taking it as a given.  *See, e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (explaining that, because "Congress legislated here in field which the States have traditionally occupied . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.").

Notably, a state law does not "stand as an obstacle" to a federal law merely because it does not actively support that law.  To hold otherwise would violate the anti-commandeering doctrine.  *See, e.g.*, *New York v. United States*, 505 U.S. 144, 166 (1992) ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." (citation modified)).  Therefore, California is entitled to permit cannabis use within its borders, and the federal government cannot command it otherwise.

Viewed in that light, California's decision to legalize medical and adult-use cannabis and adopt a regulatory framework is not only permissible but also consistent with the structure of federalism.  California's law functions as a clear statement of the state's enforcement priorities: it informs state officers, courts, and the public that individuals who use medical and adult-use marijuana in accordance with state regulations are not subject to prosecution under state law.  This is not interference from federal law; it is abstention from it.  Such an abstention thus does not create a positive conflict as defined under the preemption provision of the CSA.

In short, California's law can coexist with the CSA. It does not command any conduct that federal law prohibits, and it does not interfere with federal enforcement, all while respecting California's sovereign interest in setting its own health policy.  To treat such a law as a nullity for First Amendment purposes and collapse the doctrine of preemption into a blunt instrument for suppressing speech—as the Fifth Circuit did—would be contrary to careful balance of federalism that the Constitution demands.

### iii.    Illegality Inquiry Based on the Purpose of the Commercial Speech Doctrine

Additionally, the illegality prong of the *Central Hudson* test must be grounded in the *purpose* of the *Central Hudson* inquiry, which is to promote "the free flow of commercial information" between buyers and sellers. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976); *Bates* v. *State Bar of Ariz.*, 433 U.S. 350, 364–65 (1977) (explaining that the "free flow of commercial information" is a critical process that "serves individual and societal interests in assuring informed and reliable decisionmaking"). To promote this critical free flow of information, this Court has historically "focused principally on the First Amendment interests of the listener." *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 431–32 (1993) (Blackmun, J., concurring) (citing *Va. Bd. of Pharmacy*, 425 U.S. 748*); see also id.* at 433–34 ("[T]he listener's First Amendment interests" are the interest "from which the protection of commercial speech largely derives . . . .").

By clarifying that the consumers' interests are the focus of the analysis, the illegality prong of the *Central Hudson* test can be interpreted to acknowledge that although a listener may well have a diminished interest "in learning about commercial opportunities that the criminal law forbids," *Discovery Network*, 507 U.S. at 433 (Blackmun, J., concurring) (citing *Bates*, 433 U.S. at 364), it does not follow that federal illegality alone renders speech utterly worthless.

If the listeners' interests are what matter most, then, the Fifth Circuit's version of the test in *Cocroft*, which emphasizes cannabis's (technical) federal illegality, is counterproductive and counterintuitive. It allows a state to ban speech about a product it deems safe enough for an eligible listener to consume. It limits knowledge about a marketplace the state deems safe enough for an eligible listener to participate in. It also reflects a denial of an eligible listener's economic and prosecutorial realities. *See Expressions Hair Design* v. *Schneiderman*, 581 U.S. 37, 42–43 (2017) (quoting district court opinion explaining that the First Amendment is concerned not with technicalities, but with "economic realities"); Pub. L. No. 118-42, § 531, 138 Stat. 25, 174 (2024) (Congress's policy of non-enforcement, signaling its intent that states should make their own medical marijuana laws and policies despite the classification of marijuana as a Schedule I substance). This is not to say that federal non-enforcement *establishes* legality for prong one purposes, but this fact does contribute to the legality inquiry. Again, the goal of the commercial-speech doctrine is to elevate the interests of eligible

consumers in the free flow of information.  A nuanced application of the first prong of *Central Hudson* test accomplishes that goal.

As such, the Court finds that the underlying conduct here is lawful for the purposes of the first prong of the *Central Hudson* test.  The Court thus finds that it comes within the purview of First Amendment protections for commercial speech, and so the Court will proceed with the rest of the test.

### 2.    Whether the City Asserts a Substantial Interest

The Court finds that the City has not asserted a substantial governmental interest that justifies its restriction on commercial speech.

Although the "concept of the public welfare is broad and inclusive" and the "values it represents are spiritual as well as physical, aesthetic, as well as monetary," *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984), the government's burden in justifying a restriction on commercial speech is not satisfied by mere speculation or conjecture; instead, the government must demonstrate that the harms it recites are real and substantial.  *Valley Broadcasting Co. v. United States*, 107 F.3d 1328, 1331–32 (9th Cir. 1996); *see Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904 (9th Cir. 2009) (recognizing traffic safety and aesthetic concerns as real and substantial governmental interest).

Here, Defendants offer no argument on this factor and "pretermit[s] [Plaintiff's] discussion of the other three factors . . . in *Central Hudson*," solely relying on its argument for the first factor.  [App. Opp. at 12].  In the absence of any authority that has recognized as a substantial interest a city's attempt at mitigating its negative public perception as a "desirable place to live, visit, or invest" that may or may not affect property value or economic development, the Court finds such justifications inadequate to meet this factor.  As Plaintiff points out, the City itself has conceded that the resulting adverse impacts to economic development and public welfare in the City are "difficult to quantify."  [App. at 14].  Such speculative harm that may be caused by negative public perception of the City, without corroborating facts that explain its likelihood or degree of impact, is not a substantial governmental interest under this test.

As such, the City has not met its burden of asserting a substantial governmental interest in justifying the Ordinances' restrictions on commercial speech.

### 3.    Whether the Ordinances Directly Advance the City Interest

The Court finds that the Ordinances do not directly advance the City's asserted interest, if any were to be recognized by this Court.

"The regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993) (quoting *Cent. Hudson*, 447 U.S. at 564). Rather, the government must demonstrate that "its restrictions will in fact alleviate [the asserted harms] to a material degree." *Id.* at 762.

Here, even if the Court were to recognize the City's interest in mitigating the economic and reputational harms from the public's possible negative perceptions of the City through the cannabis advertisements, the City's own course of conduct subverts this proposed justification. The City cannot assert that cannabis advertisements on billboards within and just outside the City will skew the public's perception of the City so as to give the impression that it is "associated with drug use, nuisances, criminal activity, smoking and other health and safety concerns" while lawfully allowing cannabis businesses to operate and advertise on-site within the City. [*See* App. at 22]. Not only that, but the City has also made changes to its zoning to allow for cannabis businesses to operate more expansively within the City. [*Id.*]. The City likely would not need the help of billboard advertisements to impress onto its visitors that it is a city tolerant of cannabis businesses.

The Ordinances restricting off-site cannabis billboard advertisements are likely too ineffective or remote to advance the City's substantial interest, if any, to a material degree. As such, the Ordinances do not directly advance the City's interest.

### 4.    Whether the Ordinances Are More Extensive Than Is Necessary to Serve That Interest

A restriction is more extensive than necessary if the City has other options that could advance its asserted interest in a manner less intrusive on First Amendment rights. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 491 (1995); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 358 (2002) ("If the Government can achieve its interests in a manner that does not restrict commercial speech, or that restricts less speech, the Government must do so.").

Here, the Court finds that a complete ban of cannabis advertisements off-premises within the City and within a one-mile radius of the City that is within 660 feet of a freeway is more extensive than necessary to achieve its interest of

mitigating the potential adverse effects of negative public perception. California's
Medicinal and Adult-Use Cannabis Regulation and Safety Act expressly
recognizes local jurisdictions' authority to adopt or enforce local ordinances
regulating commercial cannabis activities, or to completely prohibit certain type of
cannabis business within the jurisdiction. Cal. Bus. & Prof. Code §§ 26000,
26030(f), 26200(a)(1). If the City wished to rid itself of the potential negative
perception of the City as a locale known for its cannabis, it is within the City's
authority to begin this process by limiting cannabis businesses within its borders.
*See, e.g.*, *City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.*,
56 Cal. 4th 729, 762 (2013) (holding that state laws do not preempt the authority of
California cities and counties under their traditional police powers to allow,
restrict, limit, or entirely exclude facilities that distribute medical marijuana).

Instead, the City has made a policy choice to foster and regulate cannabis
within its borders through its 2016 Cannabis Operation Regulatory Program, which
allows for cannabis cultivation, distribution, manufacturing, testing, and retail.
[VOE, Ex. 11; Stream Decl. ¶ 10]. Additionally, the City passed an ordinance in
2021 that also expanded the areas within the City for cannabis cultivation and
distribution within the City's commercial zone. [VOE Ex. 14; Stream Decl ¶ 13].
The City thus has other options that could advance its asserted interests in a
manner less intrusive on Plaintiff's First Amendment commercial speech rights.

As such, the Ordinances are more extensive than is necessary to serve the
City's asserted governmental interest. All of the factors in the *Central Hudson* test
that would point to a lawful restriction on commercial speech are unlikely to be
met here. Accordingly, the Court finds that Plaintiff is likely to succeed on the
merits of its claim for purposes of this preliminary injunction.

## B. Likelihood of Irreparable Harm

With respect to a likelihood of irreparable harm absent relief, the Court finds
Plaintiff has met its burden.

Irreparable harm is relatively easy to establish in a First Amendment case.
*CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). A
party seeking preliminary injunctive relief in a First Amendment context can
establish irreparable injury . . . by demonstrating the existence of a colorable First
Amendment claim." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973
(9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*.,
555 U.S. 7, 22 (2008) (citation modified). "[T]he loss of First Amendment
freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Valle Del Sol Inc.*, 709 F.3d at 829 (applying this rule to a commercial speech case).

Here, Plaintiff has demonstrated a colorable violation of its First Amendment commercial speech rights. As such, its loss of this right, even for a minimal period of time, is an irreparable injury for the purposes of preliminary injunction.

## C.   Balance of Equities & Public Interest

With respect to the balance of equities and public interest, the Court finds Plaintiff has met its burden.

To prevail on the third factor, 'the harm to Plaintiff in the absence of an injunction must outweigh the harm to Defendant as the result of one." *Daimler AG v. A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1294 (S.D. Cal. 2020) (quoting *Anhing Corp. v. Thuan Phong Co.*, No. 13-CV-05167, 2015 WL 4517846, at *24 (C.D. Cal. July 24, 2015)). This Court's conclusion at this step is dictated by the Plaintiff's likelihood of success on their First Amendment claim. "The fact that the [Plaintiff] has raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiff's] favor." *See Am. Bev. Ass'n v. San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). The balance of equities thus tips in favor of Plaintiff.

Lastly, with respect to the public interest, the Court finds the preliminary injunction will favor the public. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation modified). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation modified).

Additionally, as Plaintiff points out, the City is seeking to prevent advertisements for cannabis businesses that are legally operating in the City. [App. at 27]. The public would want to be informed when making decisions on where to visit, conduct business, or reside. The Court agrees with Plaintiff that the Ordinances are preventing the free flow of information that accurately reflects the characteristics of the City.

As such, the public interest would be served by the preliminary injunction sought by Plaintiff.

### D.    State Law Claim and Section 26152(d)

Section 26152 of the California Business Code states, "A person engaged in commercial cannabis activity, whether licensed or unlicensed, shall not . . . (d) [a]dvertise or market on a billboard or similar advertising device located on an interstate highway or on a state highway which crosses the California border."

Defendants argue that Plaintiff's state law claim under the California Constitution fails because section 26152(d) prohibits cannabis advertising on interstate highways, regardless of whether the interstate highway crosses the California border.  [Preliminary Injunction Opp. at 10–15].  Plaintiff refutes this, arguing that the limiting clause "which crosses the California border" modifies both "interstate" *and* "state" highways and thus Plaintiff's cannabis advertisements on I-215 does not run afoul of this law because the I-215 does not cross the California border.  [Preliminary Injunction Rep. at 7–9].  The Court first discusses the language of the statute itself and then considers the context of the statutory scheme as a whole.

### 1.    The Text Itself

"Statutory construction must begin with the language employed by [the legislature] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation modified); *see also, e.g.*, *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021) (explaining that when interpreting a statute, "[w]e begin with the text."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself.").

In analyzing section 26152(d)'s statutory text, the Court discusses the application of two canons of statutory interpretation: the "series-qualifier canon" and the "rule of the last antecedent."  *See Duguid*, 592 U.S. at 403–04; *see also ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, 113 F.4th 1312, 1322 (11th Cir. 2024) ("When a provision includes a list of nouns followed by a modifier, the parties usually invoke two canons: the last-antecedent canon and the series-qualifier canon." (citation modified)).

***The series-qualifier canon.***  "Under conventional rules of grammar, 'when there is straightforward, parallel construction that involves all nouns or verbs in a

series,' a modifier at the end of the list 'normally applies to the entire series.'" *Id.*
at 402–03 (citation modified) (quoting A. Scalia & B. Garner, Reading Law: The
Interpretation of Legal Texts 147 (2012)).  This is referred to as the "series-
qualifier canon" and is often applied by courts.  *See Paroline V. United States*, 572
U.S. 434, 447 (2014); *see also United States v. Bass*, 404 U.S. 336, 339–40 (1971).
"This canon generally reflects the most natural reading of a sentence." *Duguid*,
592 U.S. at 403.

Here, the modifier, "which crosses the California border," comes at the end
of an integrated clause of "located on an interstate highway or on a state highway."
*See id.* at 396 (calling the clause "store or produce telephone numbers to be called"
an "integrated cause" because the two verbs are connected using the word "or" and
share the common direct object of "telephone numbers to be called").  It would
indeed be odd to apply the modifier to just one part of the cohesive clause here.
Notably, however, the modifier "which crosses the California border" does not
follow a comma placed after "located on an interstate highway or on a state
highway." *See id.* at 403–04 ("A qualifying phrase separated from antecedents by
a comma is evidence that the qualifier is supposed to apply to all antecedents
instead of only to the immediately preceding one.")  Instead, the modifier
immediately follows "on a state highway" without a comma.  Nevertheless,
although the presence of a comma here would establish with more certainty that
the modifier applies across both "interstate highway" and "state highway," the
comma's absence does not necessarily mean that it fails to apply to both terms.
*See ECB USA*, 113 F.4th at 1324–25 ("Although commas at the end of series can
avoid ambiguity, the use of such commas is discretionary." (citation modified)).
Therefore, the resulting interpretation from applying the series-qualifier cannon is
one reasonable construction of section 26152(d).

***The last-antecedent and nearest-reasonable-referent canon.***  This canon is
generally used to help understand to what a pronoun, relative pronoun, or
demonstrative adjective is referring.  *ECB USA*, 113 F.4th at 1322 ("These are all
words or phrases that act as shorthand or substitutes for something else—such as
'she,' 'that kind of activity,' or 'such person.'")  However, courts have gone
further and applied this canon to other referential and qualifying phrases when the
text and context reinforce that reading.  *Id.* at 1323 (citing Scalia and Garner's
book and explaining how it would be more accurate to call this extended
application the "nearest-reasonable-referent canon").  This principle suggests that
such qualifying phrases normally modify only the closest reasonable noun.  Scalia
& Garner, *supra*, at 152.

Here, it is also reasonable to interpret the qualifying phrase "which crosses the California border" to only be modifying the nearest referent, "state highway," especially in the absence of a comma between these two phrases. *United States v. Paulson*, 68 F.4th 528, 538 (9th Cir. 2023) (holding that the limiting phrase does not apply to both the immediate and remote antecedents because the phrase is not separated by both antecedents by a comma and it does not follow an integrated clause that contains both antecedents). Although *Paulson* can be distinguished because the text there, unlike the text here, did not contain an integrated clause (*i.e.,* two nouns connected with the word "and" or "or" that share an object), it is not unreasonable to also conclude that "which crosses the California border" only modifies "state highway" under this canon.

Evaluating the text, punctuation, and structure of the text under these canons, by itself, yields only a slightly persuasive argument in favor of applying the series-qualifier cannon to interpret section 26152(d). The Court thus considers the statutory context to further elucidate its meaning.

## 2.    Legislative Context

Having conflicting results from using different canons to interpret the text does not end our inquiry. Canons of statutory construction, including the last-antecedent and series-qualifier canons, are not dispositive—they are just one tool of textual analysis. *See Lockhart v. United States*, 577 U.S. 347, 352 (2016) ("Of course . . . any canon of statutory interpretation . . . can assuredly be overcome by other indicia of meaning). "Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue." *Duguid*, 592 U.S. at 404 n.5. This is so because we are also bound by the canon that requires us to "strive to give effect to each word and make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 (9th Cir. 2022) (citation modified).

In passing SB. No. 94, the Medicinal and Adult-Use Cannabis Regulation and Safety Act, which amended section 26152(d), the California legislature found and declared,

> Although California has chosen to legalize the cultivation, distribution, and use of cannabis, it remains an illegal Schedule I controlled substance under federal law. The intent of Proposition 64 [and hence section 26152] and MCRSA was to ensure a

comprehensive regulatory system that takes production and sales of
cannabis away from an illegal market and curtails the illegal diversion
of cannabis from California into other states or countries.

S.B. 94, 2017 S., Reg. Sess. (Cal. 2017).

In light of this context, it is clearer as to why the California legislature
intentionally included "which crosses the California border" in section 26152(d).
If the legislature had desired to ban all cannabis billboard advertisements on all
state and federal highways in California, it would have included language doing so
For example, it could have read: "A person engaged in commercial cannabis
activity, whether licensed or unlicensed, shall not . . . (d) [a]dvertise or market on a
billboard or similar advertising device located on *all California interstate and
California state highways*." Instead, the legislature decided to specify a category
of highways in California—ones that cross the California border. The Court will
not project onto the statute what is not there. *See* Scalia & Garner, *supra*, at 93
(explaining the "omitted-case" canon, which states that nothing is to be added to
what the text states or reasonably implies—that a matter not covered is to be
treated as not covered); *id.* at 107 (explaining the "negative-implication" canon,
which says that where certain terms have been explicitly set forth in a statute, that
statute may be interpreted not to apply to terms that have been excluded from the
statute).

In addition, the California Streets and Highways Code defines "interstate
highway" to mean "any highway at any time officially designated as a part of the
national system of interstate and defense highways by appropriate authority of the
federal government." Cal. St. & Hwy Code § 746(h) (2024). And the Federal
Highway Administration of the U.S. Department of Transportation has said that the
Interstate System serves "interstate, regional, and *intra-State traffic* . . . many
routes . . . are located *entirely in one State and serve primarily intra-State traffic*."
*Interstate Highway System – the Myths*, Federal Highway Administration (Jun. 30,
2023), https://highways.dot.gov/highway-history/interstate-system/50th-
anniversary/interstate-highway-system-myths (emphasis added).

Here, keeping in mind that interstate highways like I-215 are located entirely within California and never cross the California border,[3] it would be strange for the state legislature in section 26152(d) to only qualify *state* highways that connect to the state border but not the other numerous interstate highways that cross the border. In other words, it would be difficult to find the rationale behind banning cannabis billboard advertisements on all interstate highways in California, whether or not they cross the border, while narrowing the category of state highways to only those that reach the state border. If the legislature was concerned with taking the production and sales of cannabis away from an illegal market and wanted to curtail the illegal diversion of cannabis from California into other states, where cannabis may be illegal, the most sensible explanation behind the legislature's inclusion of the "which crosses the California border" qualifier in section 26152(d) would be that this limiting language applies both to state highways *and* interstate highways.

The Court thus finds that the interpretation of section 26152(d) that results from applying the series-qualifier canon, the omitted-case canon, and the negative-implication canon most closely align with the statutory intent and context of section 26152(d)—it is the interpretation that carries the least risk of rendering "other provision of the same statute inconsistent, meaningless or superfluous." *R.J. Reynolds Tobacco Co.*, 29 F.4th at 553 (citation modified). Because the Court finds that "which crosses the California border" modifies both "interstate highways" and "state highways," the Court finds that cannabis advertisements that are along the I-215 are not prohibited under section 26152(d) because I-215 does not cross the California border.

///

///

///

////

---

[3] The Court takes judicial notice of the fact that the I-215 runs from I-15 Murrieta, North of Temecula, to the I-215/CA 60 East of Riverside, as established by Defendant's cite to a federal government webpage. [*See* Preliminary Injunction Opp. at 13 n.1; Preliminary Injunction Rep. at 10 n.11].

## IV.    CONCLUSION

The Court **GRANTS** the preliminary injunction.  [Dkt. No. 10].  Defendant, its employees, agents, successors in office, all District Attorneys, County Counsel, and City Attorneys holding office, as well as their successors in office, are hereby enjoined from enforcing the Ordinances against Plaintiff Lamar Central Outdoor, LLC or any other person or entity engaged in lawful cannabis advertising.

**IT IS SO ORDERED.**